AUSA:   Shankar Ramamurthy        Telephone:  (313) 226-9562
Special Agent:   Lloyd G. Hopkins        Telephone:  (313) 234-4347

AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

Case: 2:18-mc-50273-1
Assigned To : Goldsmith, Mark A.
Assign. Date : 2/15/2018
Description: SEARCH/SEIZURE WARRANT
(SO)

| | |
|---|---|
| In the Matter of the Seizure of | ) |
| *(Briefly describe the property to be seized)* | ) |
| All Funds on Deposit in three Monroe Bank and Trust | ) Case No |
| accounts as further described in Attachment A | ) |
| | ) |

### APPLICATION FOR A WARRANT
### TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Michigan_____ is subject to forfeiture to the United States of America under _____ U.S.C. §

See Below        *(describe the property)*:

18 U.S.C. § 981(a)(1)(A) and (C); 18 U.S.C. § 982(a); 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461 - All Funds on Deposit in three Monroe Bank and Trust accounts as further described in Attachment A, upon entry of an order by the State of Michigan Circuit Court for the County of Monroe, relinquishing jurisdiction over the enumerated accounts.

The application is based on these facts:
See Attached Affidavit

[ ] Continued on the attached sheet.

_____
*Applicant's signature*

DEA SA Lloyd G. Hopkins
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   February 15, 2018

_____
*Judge's signature*

City and state:  Detroit, MI

Elizabeth A. Stafford        U. S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF ANTICIPATORY SEIZURE WARRANTS</u>

I, Lloyd G. Hopkins (your affiant), a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows in support of the government's application for the issuance of an anticipatory seizure warrants for the following bank and investment accounts collectively referred to as the **Target Accounts**:

- Monroe Bank and Trust, Account No. 100054147, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC. **(MBT-4147)**; signer(s):  Lesly Pompy;

- Monroe Bank and Trust, Account No. 7007302049, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC. **(MBT-2049)**; signer(s):  Lesly Pompy;

- Monroe Bank and Trust, Account No. 206042147, titled as LESLY POMPY M.D.  **(MBT-2147)**; signer(s):  Lesly Pompy M.D.;

- Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605235, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC, PSP FBO LESLY POMPY  **(ML-5235)**; signer(s):  Lesly Pompy;

- Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605234, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC, PROFIT SHARING PLAN  **(ML-5234)**; signer(s):  Lesly Pompy;

- E Trade Securities, LLC, Account No. 55618412, in the name of LESLY POMPY **(ET-8412)**; signer(s):  Lesly Pompy;

- E Trade Securities, LLC, Account No. 62993195, in the name of LESLY POMPY **(ET-3195)**; signer(s):  Lesly Pompy.

The Target Accounts were originally frozen pursuant to seizure warrants issued by the State of Michigan in the Circuit Court for the Count of Monroe on September 28, 2017, and are presently the defendants in a state civil forfeiture action, Case No. 16-139517-CF. I have learned that the Prosecuting Attorney in and for the County of Monroe intends to seek an order from the State Court relinquishing jurisdiction over the Target Accounts for the purpose of allowing the federal government to institute federal forfeiture proceedings or seek criminal forfeiture on the bases set forth herein. Therefore, I respectfully request this Court issue anticipatory seizure warrants to permit federal law enforcement agents to freeze the funds in the Target Accounts immediately upon the entry of a turnover order, or order otherwise relinquishing jurisdiction over the Target Accounts, by the State of Michigan Circuit Court for the County of Monroe.

## Introduction and Agent Background

1.     I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since February 2001.  During that time, I have been assigned to the DEA Detroit Division Office and have conducted numerous drug investigations, arrests, and searches and seizures related to drug violations. Based on my training and experience, I am familiar with drug traffickers' methods of operation, including the manufacture, distribution, storage and transportation of

drugs, the collection of proceeds of drug trafficking, and the methods of money laundering used to conceal the nature of drug proceeds.

2.      I have received training and have collaborated with other law enforcement officers on investigations regarding the unlawful importation, diversion, possession, and distribution of controlled substances, as well as related money laundering investigations involving the proceeds of unlawful activities and conspiracies associated with criminal drug trafficking and violations of the Controlled Substances Act (21 U.S.C. §§ 841 and 846), and Money Laundering (18 U.S.C. §§ 1956 and 1957).

3.      I am currently assigned to the DEA Detroit Group 1, Asset Removal Group, and I assist Special Agents (SA), Diversion Investigators (DI), and Task Force Officers (TFO) in their drug investigations with tracing and seizing the proceeds of illegal activity, assets which have been purchased with the proceeds of illegal activity, and assets used to facilitate or promote a Specified Unlawful Activity (SUA).

4.      Your affiant is currently assisting the DEA Detroit Division Office Group 15, Tactical Diversion Squad, with a criminal investigation involving Lesly POMPY M.D. (Dr. POMPY) and his medical practice, INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC (INTERVENTIONAL). The case information is known to me through my participation in the investigation,

3

discussions with DEA Diversion Investigators, Special Agents and Task Force Officers, information from other law enforcement personnel, from personal knowledge, from the review of financial records and other documents, and from the statements of people having direct knowledge of the criminal scheme described in this document, which is that Dr. POMPY controlled and coordinated illegal activities including the dispensation of controlled substances outside the scope of legitimate medical practice, health care insurance fraud through over billing, and profited from these illegal activities.  Not every fact known to me is included in this affidavit.

5.      Your affiant asserts that the funds held on deposit, stored and/or invested in these financial accounts constitute the proceeds of illegal activity and/or are traceable to the proceeds of illegal activity, specifically:  Controlled Substance offenses, in violation of Title 21, U.S.C. §§  841, 846; and/or Health Care Fraud, in violation of 18 U.S.C. §§  1347, 1349; and/or Money Laundering, in violation of 18 U.S.C. § 1956 and § 1957; and/or constitute property involved in, or are traceable to property involved in Money Laundering in violation of 18 U.S.C. § 1956, § 1957.

## Violation Statutes

4

6.     Title 18, United States Code, Section 1347, prohibits health care

fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme

or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

7.     Title 18, United States Code, Section 1349 states that any person who

attempts or conspires to commit this health care fraud offense is subject to the

same penalties.

8.     Title 18, United States Code, Section 24(b), defines a "health care

benefit program" as, among other things, "any public or private plan . . . affecting

commerce, under which any medical benefit, item, or service is provided to any

individual, and includes any individual or entity who is providing a medical

benefit, item, or service, for which payment may be made under the plan."

9.     Title 21, United States Code, Section 841(a)(1), provides that it is

unlawful for any person knowingly or intentionally to manufacture, distribute, or

dispense or possess with intent to manufacture, distribute, or dispense, a controlled

substance.

10. Title 21, United States Code, Section 846 states that any person who attempts or conspires to commit this controlled substance offense is subject to the same penalties as those prescribed by the offense.

11. Title 18 of the United States Code, Section 1956 prohibits engaging in monetary transactions in property derived from specified unlawful activity:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A) with the intent to promote the carrying on of a specified unlawful activity;

(B) knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the rouse, the ownership or control of the proceeds of specified unlawful activity.

12. Title 18, United States Code, Section 1956, sets forth a list of "specified unlawful activities," which includes, "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

13. Title 18, United States Code, Section 1957 prohibits knowingly engaging in or attempting to engage in a monetary transaction in criminally derived property or a value greater than $10,000 and is derived from specified unlawful activity.

**<u>Applicable Forfeiture Statutes</u>**

14.     21 U.S.C. § 853 provides for criminal forfeiture of the proceeds of controlled substance violations.  A person who is convicted of a controlled substance violation, where the violation is punishable by more than a year imprisonment, "shall forfeit to the United States, irrespective of any provision of State law any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation," and/or any property "used or intended to be used, in any manner or part, to commit, or facilitate the commission of such violation." 21 U.S.C. §§ 853(a)(1) and 853(a)(2).

15.     21 U.S.C. § 881(a)(6) provides for civil forfeiture of the proceeds and facilitating property of controlled substance violations:

> (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable too such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

16.     18 U.S.C. § 981 *Civil Forfeiture*

(a) (1) The following property is subject to forfeiture to the United States:

> (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property.
>
> \*            \*            \*            \*
>
> (B) Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029,

1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

(b)(1) Except as provided in section 985, any property subject to forfeiture to the United States under subsection (a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service, respectively.

(b)(2) Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure . . .

(b)(3) Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

17.     18 U.S.C. § 982 *Criminal Forfeiture*

(a)(1) The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

         *         *         *         *

(a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

18.     18 U.S.C. § 984 *Civil Forfeiture of Fungible Property*

(a)(1) In any forfeiture action in rem in which the subject property is . . . funds deposited in an account in a financial institution . . .

         (a) it shall not be necessary for the Government to identify the

8

specific property involved in the offense that is the basis for forfeiture; and

(b) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

### **Prescriptions and Drug Schedules**

19.  "If a person is charged in a criminal case with a violation of an Act of Congress for which civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." 28 U.S.C. § 2461(c).

20.  21 U.S.C.§ 830 (b) (3)(A) (ii) defines a valid prescription as a prescription which is issued for a legitimate medical purpose, by an individual practitioner licensed by law to administer and prescribe the subject drugs, who is acting in the usual course of the practitioner's professional practice in issuing the prescription. 21 U.S.C. §842 (a) (1) states that it is unlawful for any person who is subject to the requirements of licensure to distribute or dispense a controlled substance in violation of section 829 of this title.

21.  21 C.F.R. § 1306.04 (a) states that "a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The

9

responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

22.     The Drug Enforcement Administration (DEA) has determined that certain prescription medications are "controlled," based on their potential for addiction and abuse.  DEA assigns Schedules to these prescription medications according to their potential for abuse and addiction, with a controlled substance in Schedule II having the highest potential for addiction and abuse.  Prescription drugs which are controlled are assigned to Schedules II, III, IV or V.  Schedule II narcotics include Methadone, Oxycodone, Morphine Sulfate, Hydromorphone, and Hydrocodone (common trade name: Vicodin).  Ketamine is Schedule III controlled substance.  Schedule IV controlled substances include the depressant Alprazolam (common trade name: Xanax).  Schedule I controlled substances are considered to have no medical purpose, and are therefore not prescribed.

23.     A combination of federal statutes and regulations control the lawful dispensing or distribution of Schedule II through V controlled substances.  The United States Sixth Circuit Appellate Court, along with other courts, has held that it is unlawful for a practitioner to distribute a Schedule II-V controlled substance if the doctor or pharmacist is not acting within the usual course of professional

practice, in violation of 21 U.S.C. § 841, United States v. Johnson, 71 F.3d 539, 542 (6th Cir. 1995), cert. denied, 517 U.S. 1113 (1996).

## MAPS

24.    MAPS is an online database, maintained by the Michigan Department of Community Health.  It is a prescription monitoring program which maintains a record of all controlled substance prescriptions that have been written and filled at a pharmacy within the State of Michigan.  MAPS collects all prescription and dispensing information for Schedule II-V controlled substances prescribed or dispensed within the State of Michigan.  MAPS is available to Michigan practitioners.  It enables them to determine whether patients are receiving controlled substances from other providers and assists in the prevention of prescription drug abuse.  It is also utilized by law enforcement agencies to assist in their investigations.  Pharmacies are required to input data into MAPS about the patient, prescribing physician, pharmacy that filled the prescription and the details of the controlled substances prescribed.

## Probable Cause

25.    An investigation conducted by DEA and the Monroe Area Narcotics

Team and Investigative Service (MANTIS) found that Dr. POMPY engaged in the

illegal diversion of controlled substances, in violation of 21 U.S.C. §§ 841, 846,

and submitted claims for reimbursement to Medicare and Medicaid for services

that were either (a) medically unnecessary, or (b) not provided as billed, in

violation of 18 U.S.C. §§ 1347, 1349.

Overview of Investigation

26.    In November 2015, DEA TFO Shawn Kotsch, Michigan State Police

(MSP) Det/Lt Marc Moore of MANTIS, and Blue Cross Blue Shield of Michigan

(BCBSM) investigators, began an investigation into the medical practice of Dr.

Lesly POMPY.

27.    Dr. POMPY is a Medical Doctor and anesthesiologist at Promedica

Monroe Regional Hospital in Monroe, MI.  Dr. POMPY also owns and operates

INTERVENTIONAL, a pain clinic, located at 730 N. Macomb St., Suite 222,

Monroe, MI.

28.    DEA, MANTIS, and the Monroe County Prosecutors Office, with the

assistance of BCBSM, began the investigation as a result of numerous concerns

and complaints from the public regarding the amount of controlled prescription

drugs Dr. POMPY prescribed.  DEA also obtained information pertaining to seven

drug-overdose deaths of Dr. POMPY's patients in the Monroe County area.  Five

of the seven died due to multi-drug intoxication and two due to heroin use.

Finally, BCBSM data shows that Dr. POMPY is the "number one" BCBSM

prescriber of controlled prescription drugs.

<u>Undercover Visits to INTERVENTIONAL</u>

29.     In 2016, BCBSM began an investigation into Dr. POMPY's

prescription practice, using an undercover investigator. The following paragraphs

document seven undercover visits to INTERVENTIONAL at 730 N. Macomb St.,

Suite 222, Monroe MI, reported by BCBSM Investigator Howell.

30.     Investigator Howell contacted Dr. POMPY's office and learned that

they were accepting new patients. Investigator Howell was advised that he would

need to complete new patient paperwork and that he needed a referral from a

family doctor.

*Visit 1 – January 2, 2016*

31.     On January 2, 2016, Investigator Howell entered

INTERVENTIONAL. Investigator Howell made contact with an employee at the

front desk who provided him with a 20-page new patient questionnaire. He was

instructed to take the paperwork home and return it at a later date. He was also

reminded that he was required to obtain a referral from a family doctor for pain

management.

*Visit 2 – January 26, 2016*

13

32.   On January 26, 2016, Investigator Howell entered INTERVENTIONAL to drop off the completed new patient paperwork and a referral from a BCBSM consultant.  The new patient paperwork indicated that Investigator Howell suffered from back stiffness and nerve problems but did not set forth "pain" as a symptom.

33.   After dropping off the paperwork, Investigator Howell spoke to patients waiting in the hallway.  A female patient told him that he would not get medications on his first visit.  She further stated that Dr. POMPY would go over test results, do an exam, and possibly suggest a pain block, before prescribing pain medication.

34.   A male patient provided the same information but added that he did not get medications until his third visit.  Investigator Howell asked what he did in the meantime.  The patient said, "I got sick."  Investigator Howell took this to mean that the patient suffered from symptoms of withdrawal from prescription pain medication.

*Visit 3 – February 18, 2016*

35.   On February 18, 2016, at 3:44 P.M., Investigator Howell entered INTERVENTIONAL, submitted a five dollar copay, and provided a urine sample. Investigator Howell told an employee that he presently took "Norco and Xanax".

36.   At approximately 4:35 PM, Investigator Howell was weighed and taken to an exam room. Investigator Howell said the purpose of his visit was "meds, just refills."

37.   While waiting for Dr. POMPY, an employee told Investigator Howell that twenty (20) employees worked in Dr. POMPY's office and that the facility had eleven (11) exam rooms with two (2) employees per room.

38.   Investigator Howell's blood pressure and pulse were taken and he told a different employee the purpose of his visit was "refills".

39.   When asked if he wanted medications for pain or addiction, he responded that he wanted medications for pain.

40.   Investigator Howell was asked several questions about pain. He did not provide a pain level and used the term, "stiff" to describe his condition. Investigator Howell then completed an exam consisting of grip strength, arm and leg strength, ankle flexibility, and bending forward and back. An employee touched down Investigator Howell's spine to find the pain location. He directed her to the middle of his lower back and said that it was stiff. The employee placed a stethoscope on Investigator's back and listened. The general exam ended at approximately 4:49 PM.

41.   At approximately 4:54 PM, Dr. POMPY entered the room and said "so basically you have back pain." Investigator Howell replied, "ya back-really

stiff and sore back." Dr. POMPY then asked the Investigator where most of the pain was.  Investigator Howell stated that he gets low back stiffness because he drives a lot.

42.     Dr. POMPY looked at Investigator Howell's back and touched it. Dr. POMPY also tested Investigator's leg strength, grip strength, had him move his neck around, bend forward and back, and checked his reflexes.  Dr. POMPY then listened to Investigator Howell's back and chest.

43.     During the physical exam, Dr. POMPY felt that Investigator Howell had phones in his pocket.  Dr. POMPY told Investigator Howell that he thought the Investigator had a wire in his pocket.  Dr. POMPY then stated, "we got people coming in here with wires".

44.     Dr. POMPY told Investigator Howell that it's possible that he has some kind of disc disease.  Dr. POMPY discussed physical therapy and said that is all that Investigator Howell may need.

45.     Investigator Howell then asked Dr. POMPY if he could get Norco. Dr. POMPY replied, "You look like an undercover agent to me right now.  You know it doesn't work like that, you gotta get your testing done and urine drug screen." Dr. POMPY then told Investigator Howell that it takes seven days for the urine results.  Dr. POMPY then asked, "You trying to trap me?"

46. Dr. POMPY left the room at approximately 5:02 PM. Investigator Howell was instructed to wait in the exam room. Two employees came back into the room. Investigator Howell asked the employees why Dr. POMPY got upset when he asked for Norco. A male employee told Investigator Howell that the "Feds" are always on him. A female employee stated that Dr. POMPY was upset because two doctors in Monroe County got "busted". The female also stated that there have been undercover agents in the office before, but they don't know who they are.

47. Investigator Howell was again asked his current pain levels, to which he refused to offer a pain level but described his condition as back stiffness. Investigator Howell was not given a prescription on this date.

**Visit 4 – March 22, 2016**

48. On March 22, 2016, Investigator Howell arrived at INTERVENTIONAL. Investigator Howell was given a questionnaire in which he indicated back stiffness, not pain, and completed a urine screen.

49. At 5:06 PM, Investigator Howell was weighed and taken to an exam room where his blood pressure was taken.

50. At 5:09:12 PM, Dr. POMPY entered the room. Dr. POMPY shook Investigator Howell's hand and said hello. Dr. POMPY asked if Investigator had any questions. Investigator Howell stated that he did not have any questions. Dr.

POMPY left the room at 5:09:49 PM.  Investigator Howell reported that Dr.

POMPY was in the room for approximately 37 seconds.

51.     An employee asked if Investigator Howell had been prescribed

"Stuff" before.  Investigator Howell told her that he had not, but that was the

purpose of his visit.  The employee asked if this was his second visit and if he

needed to go over testing.  He informed the employee that he could not get the tests

done as his insurance would not pay for them.  Investigator Howell told the female

employee that he needed a refill for Norco 7.5(mg) and Xanax.

52.     Investigator Howell told the female employee that he had done

physical therapy, however he does better with the medications.

53.     The employee left the room to consult with Dr. POMPY about getting

Investigator Howell a prescription.  The female employee returned and said that

Dr. POMPY would at least need MRIs before prescribing anything because Dr.

POMPY had to have some "documentation to show you need the medications".

The female employee said that if Investigator Howell could get x-rays and blood

work to start with, it would be enough.

54.     The female employee printed diagnostic testing orders for a Bone

scan, EKG, MRI-Lumbar, X-ray chest, X-ray knee, and blood laboratory work.

The female employee told Investigator Howell the government was coming down

on pain management doctors, so Dr. POMPY had to have documentation.
Investigator Howell left the office at 5:21 PM.

*Visit 5 – April 26, 2016*

55.    On April 26, 2016, Investigator Howell arrived at
INTERVENTIONAL at 2:56 PM.  Investigator Howell filled out a questionnaire in
which he stated that he had back stiffness, not pain.

56.    At 3:22 PM, Investigator Howell was called to the back by an
employee named Sarah, a Medical Assistant.

57.    Sarah weighed Investigator Howell and took him to an exam room.
Investigator Howell told Sarah he was at the office to get medication refills.  He
then provided Sarah with an x-ray reading in his undercover name.  The reading
was written by a BCBSM consultant and it gave no indications to justify pain
medications.  Sarah asked Investigator Howell if he was taking Norco, Ativan and
Soma.  He said he was.

58.    At 3:43:37 PM, Dr. POMPY entered the exam room with Investigator
Howell.  Dr. POMPY greeted Investigator Howell and said he had a little bit of
gall bladder disease but it was very early and that he should watch his fatty intake.

59.    Dr. POMPY then stepped over to Sarah's computer.  Sarah told Dr.
POMPY twice that this was Investigator Howell's third visit.  Dr. POMPY asked
Investigator Howell what he was looking for, and he said he usually gets Norco for

19

his back. Dr. POMPY then reviewed Investigator Howell's urine drug screens. Dr. POMPY then left the room at 3:44:28 PM.

60. Sarah printed off Investigator Howell's previous drug screen results and told him that he tested positive for barbiturates, which could result from taking Xanax and as long as he was getting them from a doctor there wouldn't be any problems.

61. Investigator Howell was told that if he gave a urine sample that day he could get more than two (2) weeks of medications.

62. Investigator Howell went to the next room to give a urine sample. Investigator Howell told the lab employee that he did not take any medications just Bud Light and Moonshine. The employee informed Investigator Howell that the samples are sent to Tampa, and if there is a discrepancy, Investigator Howell could call them. Investigator Howell then returned to the exam room.

63. At 4:07:24, Dr. POMPY returned to the exam room. Sarah told Dr. POMPY that Investigator Howell wanted to get medications and that it was his third visit. Dr. POMPY said, "Okay". Dr. POMPY wrote Investigator Howell's prescription into his drug screen report. Dr. POMPY then verbally ordered Norco, Lyrica, and Zanaflex and to see Investigator Powell back in two (2) weeks. Dr. POMPY left the room at 4:09:40.

64.     Dr. POMPY was in the room approximately two (2) minutes and sixteen (16) seconds.  Investigator Howell was prescribed 42 tablets of Norco 5/325 mg and 60 capsules of Lyrica 50mg.

65.     The prescriptions were filled at Walgreens 1285 N. Monroe St, Monroe Ml.  D/Lt Marc Moore was present and the prescriptions were turned over to him for processing.

### Visit 6 – May 9, 2016

66.     On May 9, 2016, Investigator Howell arrived at INTERVENTIONAL at 4:11 PM.  Investigator Howell completed a questionnaire in which he stated that he had back stiffness, but not pain.

67.     Investigator Howell was given paperwork ordering a urine drug screen and was then told to submit to a urine test.  He provided a urine sample, which was checked with a rapid test and was completely negative.

68.     At 4:53 PM, Investigator Howell was called to the back, weighed, and taken to an exam room.  Investigator Howell told an employee he was there to get medication refills.

69.     Investigator Howell learned from an employee that Subsys had a sales representative who worked at the INTERVENTIONAL office.  Subsys is a sublingual fentanyl spray which is FDA approved for the management of

21

breakthrough pain in adult cancer patients who are already receiving around-the-clock opioid therapy for their underlying persistent cancer pain.

70.     At 5:07:12 PM, Dr. POMPY entered the exam room and greeted Investigator Howell. Dr. POMPY directed his attention to Investigator Howell's paperwork and said, "no Hydrocodone, problem," referring to his urine drug screen. Dr. POMPY did not look at Investigator Howell or make any comments to him. Dr. POMPY then stated that he needed to see Investigator Howell again in a week. At 5:08:30, Dr. POMPY left the room.

71.     The employee provided Investigator Howell with two prescriptions: Norco 5/325 mg tablets (postdated for 5/10/16) and Lyrica 50mg caplets (postdated for 5/24/16). Investigator Howell left the office at 5:11 PM.

72.     The prescriptions were filled at Walgreens 1285 N. Monroe St., Monroe Ml. D/Lt Marc Moore was present and the prescriptions were turned over to him for processing.

**Visit 7 – May 17, 2016**

73.     On May 17, 2016 Investigator Howell arrived at INTERVENTIONAL at 5:46 PM. He completed a questionnaire saying that he had back stiffness, but not pain. He was then ordered to submit to a urine test.

74.     Before he could submit to the urine test, Investigator Howell was called to the back by Sarah. She weighed him and took him to an exam room.

75.     Investigator Howell told Sarah he was there for medication refills. She commented that he did not have any Norco in his previous urine screen. Investigator Howell asked if Sarah thought that Dr. POMPY would prescribe him anything stronger and she said that he probably would not since the test was negative.

76.     At 7:09:00 PM, Dr. POMPY entered the exam room and greeted Investigator Howell.  Dr. POMPY handed Investigator Howell a prescription for Norco 5/325 mg and said that he needed to give a urine sample and that he would be checking the results.

77.     Dr. POMPY left the room at 7:09:50 PM.  Investigator Howell noted that Dr. POMPY was in the exam room for fifty (50) seconds.  Investigator Howell then submitted to a urine drug screen.

78.     Investigator Howell turned over the paper prescription for Norco 5/325 mg, 21 tablets to D/Lt Marc Moore for processing.

Medical Review of Undercover Visits

79.     BCBSM consulted with Dr. Carl Christensen to conduct medical reviews of Investigator Howell's visits to INTERVENTIONAL.  The reviews are based upon video recordings made by Investigator Howell, who utilized a covert video camera system to record the office visits.

80.  Dr. Christensen determined based on his review of the February 18, 2016 visit that "[a]lthough deficient in identifying the apparent underlying drug seeking behavior of the investigator, this visit appears otherwise to be within the standard of care."

81.  Dr. Christensen found based on his review of the March 22, 2016, visit:  "The appearance of this visit is to qualify for opioids by requiring an MRI, and to make the investigator jump through enough hoops to receive opioids," however, "[t]he lack of correlation between MRI findings and back pain is well known, especially to a physician with Dr. POMPY's qualifications." Further, "[n]o apparent examination or review of the valid parts of a medical interview (chief complaint, history of present illness, review of the symptoms and changes in personal history) appear to have been done."

82.  Dr. Christensen made the following findings concerning the April 26, 2016, visit:  "There is no justification for these medications [referring to Norco, Lyrica and Zanaflex]."  The primary reason for these prescriptions appears to be that 'he is here for his third visit'.  This visit appears to be outside the standard of care for the practice of medicine."

83.  Dr. Christensen also reviewed the drug screens from the Ferbuary 18 and March 22, 2016, visits, which were positive for diazepam and barbiturates, respectively, and determined: "Note that although the investigator denies taking

24

these medications, and there was no chain of custody done, these results should have at least triggered an investigation before prescribing him additional controlled medications."

84. Dr. Christensen made the following finding concerning the May 9, 2016, visit: "There was no medical justification for these medications [Norco and Lyrica]. There was no medical visit. There was no complaint that justified continuing them. There was an abnormal urine drug screen (no hydrocodone found despite a prescription), but the only change was to have him return in one week. This would not help identify or address whether the 'patient' was abusing, hording or selling their medication. This visit appears to be outside the standard of care of medicine".

85. Dr. Christensen determined the following concerning the May 17, 2016, visit: "This 'office visit' was entirely without medical justification. Problems with the visit include: (a) The questionnaire identified the main complaint as "stiffness", not pain. This is not an indication for a narcotic; (b) The investigator identified use of alcohol and drugs as coping mechanisms, yet there was no discussion of this or investigation of this admission of possible drug and alcohol abuse; (c) Despite his urine not showing the prescribed medication, he received another prescription, without any investigation of this aberrant behavior; and (d) There was no legitimate medical examination . . . This visit appears to be

outside the standard of care of the practice of medicine; and the medications do not appear to have been prescribed for a legitimate medical purpose by a physician acting in the usual course of a professional practice in the United States".

Interviews with INTERVENTIONAL Employees

86.     On September 26, 2016, MANTIS Detectives, supported by DEA personnel, executed Michigan State Search Warrants on INTERVENTIONAL and Dr. POMPY's home located at 533 North Monroe Street, Monroe, Michigan.

87.     Following the execution of the search warrant, Investigators interviewed Susan Welker, a registered nurse employed by Dr. POMPY, at INTERVENTIONAL.  The following are excerpts from her interview report:

88.     Welker, a registered nurse who has worked for POMPY for eight years, stated that Norco and Oxy (Oxycontin) are the most prescribed drugs.  She also thought the majority of INTERVENTIONAL's patients receive pain medications.

89.     Welker told investigators that INTERVENTIONAL averages 150-200 patients per day, and had seen 355 patients the previous Monday.  After she made the statement about seeing 355 patients, she said, "Oh, I probably shouldn't have said that." Welker was aware of patient deaths.

90.     On September 26, 2016, Investigators also interviewed Donna Knierim, a medical and office assistant employed by Dr. POMPY, at

INTERVENTIONAL. Knierim stated INTERVENTIONAL had seen over 300

patients once but 100-200 was common.

Interview with Dr. POMPY

91.    On September 26, 2016, DI Bishop, TFO Kotsch and MANTIS

Detective Lieutenant Marc Moore interviewed Dr. POMPY in his office at

INTERVENTIONAL. During the interview, Dr. POMPY said that he saw

anywhere from 60 to 175-200 patients per day. Dr. POMPY guessed that the most

patients he had seen in a day was 250.

92.    When asked if he had ever seen 300 patients in a day, Dr. POMPY

told investigators "once in a while like I am not going to be there, and then the

patients need their refill, and we want to get them seen, get them refilled, we might

get them to just come in to make sure they have their medication refill." He

admitted to billing for these visits because he would "see" the patients.

Interviews with INTERVENTIONAL Patients

*Patient L.O.*

93.    On October 6, 2016, MANTIS Detectives interviewed L. O., a patient

of Dr. POMPY for between eight and ten years prior. L. O. stated she sought pain

treatment because she had fallen and hurt her back. Dr. POMPY only conducted

one physical examination in the period he saw L.O., on the first visit. He diagnosed

her with a bulging disk and prescribed her Norco. All future visits were short, no

more than five minutes. For the first several years INTERVENTIONAL never tested L.O.'s blood pressure, and only began doing so in the roughly two years prior to the interview.

94.     INTERVENTIONAL only performed random urine tests of L.O., rather than on every visit. L.O. was a Methadone user, in addition to using the Norco prescribed by POMPY. On one random screening, L.O. tested positive for the presence of Methadone and Norco. POMPEY reviewed the results but continued to prescribe Norco without questioning L.O. on her use of Methadone from an unknown source.

95.     L.O. told POMPY on several occasions that Norco was not helping and she wanted a different drug. POMPY continued to only prescribe Norco.

96.     The only warning POMPY gave L.O. on her Norco use, was that she was going to end up with a colostomy bag because of the opiate use. He continued to prescribe L.O. Norco after making this comment, without suggesting alternatives for her to deal with her pain, or considering possible addiction.

97.     At one point during her time as a patient of Dr. POMPY, L.O. became pregnant. L.O. stated that she had a miscarriage and lost the baby. During the pregnancy Dr. POMPY prescribed L.O. Suboxone. L.O. stated that she became pregnant again and this time delivered her child who then had to be weaned off the medications.

**Patient E.S.**

98.    On January 18, 2017, DEA Diversion Investigator Brian Bishop and
MANTIS Detective Robert Blair interviewed former Dr. POMPY patient, E.S.
E.S. had been seeing Dr. POMPY for between eight and ten years for shoulder
pain, and was being prescribed Norco, Lyrica, and Subsys by POMPY.  Subsys is
FDA approved for the management of breakthrough pain in adult cancer patients.
E.S. was not a cancer patient.

99.    E.S. reported that POMPY was only in the room for a few minutes for
each appointment. At times, there would be patients lined up down the hallway
leading to POMPY's office.

**Patient B.S.**

100.   On January 18, 2017, DEA Diversion Investigator Brian Bishop and
MANTIS Detective Robert Blair also interviewed former Dr. POMPY patient, B.S.
B.S. was also seen by Dr. POMPY for between eight and ten years, and received
Percocet, fentanyl, and Lyrica prescriptions for back pain.   B.S. stated that the
waiting room is usually full and on occasion people are lined up in the hallway
leading to Dr. POMPY's office.  When B.S. saw POMPY it was only for a few
minutes.  When she first began seeing POMPY, he did not discuss any test results
with her, but told her that her back was a "mess."  Dr. POMPY told B.S. she was a

drug addict, but did not discuss addiction treatment. B.S. also said that she knew of a male "patient" who was selling Dr. POMPY's prescriptions.

**Patient R.F.**

101.   According to MAPS, Dr. POMPY prescribed R.F. oxycodone, oxymorphone, Butrans patch, Ambien, Xanax, and Subsys. Subsys is FDA approved for the management of breakthrough pain in adult cancer patients. R.F. was not a cancer patient.

102.   During the interview, R.F. stated that R.F. and his spouse were both patients of Dr. POMPY. R.F. started going to Dr. POMPY six years ago and there was always a long wait at his office. When R.F. did see Dr. POMPY he was only in the room for a few minutes and never discussed test results with him.

**Patient R.B.**

103.   R. B. had been seeing Dr. POMPY for a year prior to the interview with investigators. R.B. received a number of pain block procedures and prescriptions for tramadol, morphine, oxycodone, and Subsys. Subsys is FDA approved for the management of breakthrough pain in adult cancer patients. R.B. was not a cancer patient.

104.   R.B. routinely waited for hours to see Dr. POMPY and the waiting room was always full with people also waiting in the hallway. Once in an exam room, Dr. POMPY would arrive, sign some paperwork, and leave. Dr. POMPY

would not discuss R.B.'s urine screens with him, despite the screens showing positive for Suboxone and other medications.

105. On May 1 and 2, 2017, investigators interviewed former Dr. POMPY patients and employees. The following is a summary of those interviews:

**Patient K.R.**

106. K.R. began seeing Dr. POMPY in June of 2013 for back and neck pain. K.R. stated that on average she would wait for one to two hours see Dr. POMPY and that each visit with POMPY lasted about five minutes. When K.R. started going to POMPY, urine samples were collected randomly. Shortly before the search warrants were conducted at INTERVENTIONAL, POMPY began collecting urine samples at each visit however, the results of the screens were not discussed. K.R. was prescribed a number of different narcotics by POMPY, who never discussed his reasons for changing medications or the dangers involved in long term opiate use. K R. once had a positive drug screen for cocaine and was put on Suboxone without discussion of drug addiction.

107. Investigators spoke with three additional patients, D.M., A.M., and F.E., who reported nearly identical experiences at INTERVENTIONAL, the hours-long wait times, the small amount of time seen by Dr. POMPY, and POMPY's lack of discussing treatment or addiction.

Interviews with Former Employees

**_Former Employee Jeanette Beeler_**

108.   Jeanette was a Medical Assistant at INTERVENTIONAL from May 13 to September 26, 2016.  During the time Jeanette worked for Dr. POMPY, she witnessed the employee at the front desk check in patients and begin charging their medical insurance from the time the patient arrived, not the time they saw Dr. POMPY, as required by Medicare.

109.   Patients waited for hours before being called back to the exam rooms. Once in the exam rooms, the patients would be in and out in about five minutes.

110.   At times, Dr. POMPY would have Jeanette, and other employees, alter patient records to allow patients to get prescriptions before they were medically necessary.  Jeanette explained that if a patient came in before their last prescription had run out and was not due for a refill, Dr. POMPY would instruct her to go into the patient's computer file and change the date of the previous prescription to a date to that would allow a new prescription to be issued.  Jeanette started to get nervous because this did not seem right to her.

111.   Dr. POMPY had 16 and 17 year olds working at his office as Medical Assistants.  When Jeanette questioned Dr. POMPY about the teenagers doing her same job he told her not to worry about it.

32

112.   Dr. POMPY would often have patients enter the office from a side door.  When patients entered from the side door they would meet with Dr. POMPY in his office. The patients would leave with a brown paper lunch bag. Jeanette did not know what was in the bag. Jeanette knew these were patients because she had seen them at INTERVENTIONAL as patients.  When Jeanette asked why some patients were allowed to enter via the side door and go directly into Dr. POMPY's office, she was told by a fellow staff member to mind her own business.  These patents would be in Dr. POMPY's office for up to 45 minutes and he saw them one at a time.

113.   Prescriptions were routinely written by employees and Dr. POMPY would sign them.  Jeanette witnessed 16 year old medical assistants fill out the prescriptions for patients.

114.   Some of INTERVENTIONAL's patients would, "pharmacy hop," (meaning they would fill their prescriptions at a variety of pharmacies so the pharmacies would be less likely to question the overall quantities or combinations of controlled substances they were receiving).  Jeanette ran a MAPS report on one such patient and showed Dr. POMPY that they were using multiple pharmacies. Dr. POMPY took the MAPS report and did not return it to Jeanette to put in the patient's file.

115.   On one occasion, a pharmacy called and questioned a prescription. Jeanette ran a MAPS report on the patient and told the pharmacy not to fill the prescription as they were not due for the medications.  Dr. POMPY yelled at Jeanette for doing this.

116.   During Jeanette's employment, Dr. POMPY saw 244 patients in one day.  On a slow day, he saw about 150 patients.  Dr. POMPY would walk into the exam room shake the patients hand then walk out.  If Dr. POMPY did an exam, it was quick.  Jeanette did not see Dr. POMPY enter any data into the patient file.

117.   Jeanette described an average visit to Dr. POMPY's office as starting with the patent waiting for hours to be called to the back.  During this time, the medical assistant would collect paperwork, and take the patient's vitals, blood pressure etc.  The medical assistant entered data into the computer as it was obtained.  If a new prescription was needed, the medical assistant printed it out before Dr. POMPY entered the room.  For example, if the patent was on Norco but wanted a new medication, Dr. POMPY would be advised of this when he entered the room.  Dr. POMPY would have the Medical Assistant print another prescription and have them give that to the patient along with the original prescription for Norco.  Jeanette did not think this was the right thing to do and even made a comment to Dr. POMPY about this leading to addiction, stating,

"[t]his is how my son got hooked." Dr. POMPY told Jeanette to not make any further comments like that.

118.   Jeanette stated that some patients would be required to take urine screens but not all of them. If there was a yellow mark on the paper the patient was to do a urine screen. Jeanette stated that the lab technician would inform Jeanette if the patient had tested "dirty," meaning had a positive urine screen. Jeanette stated that she only saw one patient be told to leave the practice for a dirty test, but only because the patient argued with Dr. POMPY.

119.   Jeanette stated that on average, if someone tested positive for street drugs or did not have their prescribed medications in their system, Dr. POMPY wrote them the prescription anyway. Dr. POMPY would require that they come back more often but would give them the prescription. Jeanette stated that she recalled that Dr. POMPY had one patient come in everyday for a while to get his prescription. Jeanette stated that this subject was male and had committed suicide in Monroe (in a previous statement on September 26, 2016, Jeanette stated the subject's name was Jerry Taylor and that he had jumped from a bridge in Monroe.). Jeanette thought that this patient was being prescribed Suboxone. When Dr. POMPY had people come in once a day or week he billed for the office visit. If the insurance company did not pay the office visit, the patient was required to pay cash.

120.    Jeanette once heard Kayla (another employee) tell a patient that if they did not submit to pain blocks Dr. POMPY would no longer write her prescriptions. The pain blocks are very painful. Jeanette is familiar with a number of people who suffer from complications due to Dr. POMPY's procedures.

121.    Patients would also be seen when Dr. POMPY was not in the office. If Dr. POMPY was in a meeting or on vacation, a Nurse Practitioner was on site and would sign the prescriptions for Dr. POMPY. The prescriptions signed by the Nurse Practitioner had Dr. POMPY's name on them.

122.    Jeanette heard that patients were selling medications. On one occasion Jeanette went to get a patient and walked into the middle of a conversation between two patients. One had asked the other if they could buy their pills once they had them and the other agreed. Jeanette brought this conversation to Dr. POMPY's attention. Dr. POMPY told her not to worry about it that he would deal with it. Dr. POMPY wrote the prescription anyway. Jeanette confronted Dr. POMPY about this again and he told her, "Don't worry about it. Do your job."

123.    Dr. POMPY gave bonuses based upon the number of patients that were seen. Jeanette stated that at one point 800 patients were seen in a week and she received a 250 dollar bonus for this. Angela (another INTERVENTIONAL employee) told Jeanette that she received a 600 dollar bonus because of the cash

patients she brought into the office.  Bonuses were based on the number of patients, not the quality of work provided by the employees.

### Former Employee Jennifer Nash

124.  Jennifer she was a Medical Assistant at INTERVENTIONAL from August 31, 2015 to August 25, 2016. In addition to being a Medical Assistant she would do pre-authorization for prescriptions.  Jennifer stated that she was not a licensed Medical Assistant and Dr. POMPY knew that she was not licensed.

125.  Jennifer believed Dr. POMPY was doing illegal things at his practice. For example, if a patient came in and their prescription was not due for another three weeks he would have Jennifer alter their records to make the prescription due the date of the visit.  When Jennifer asked Dr. POMPY why he would do that, he told her to just do as she was told.

126.  During her employment, the task of getting pre-authorizations for prescriptions was added to her duties.  Insurance companies would often contact INTERVENTIONAL and question the prescription.  The insurance companies would question why patients were on multiple narcotics or why other medications had not been tried prior to stronger medications.  When Jennifer asked Dr. POMPY about this he told her he did not care and to do her job.  If an insurance company denied the medications the patient would have to pay cash to get the prescription. Jennifer was instructed by Dr. POMPY and the office manager Diana Knight to

37

alter letters to insurance companies to reflect that treatments were tried and failed, to get the insurance company to pay for the medications. Jennifer stated that the treatments were not listed in the patients file and these were false statements.

127.   Not all patients were required to submit to a urine screen. If a patient had a dirty urine screen they would still get their prescription but would have to come back sooner. Even if a patient had previously had a dirty urine screen and was returning to the office every two weeks, Dr. POMPY would not always have the patient re-submit to a urine screen.

128.   There were a number of occasions where Dr. POMPY would prescribe a medication and the insurance company would question the prescription. Diana and Dr. POMPY would tell Jennifer to alter the response even if it did not match what was actually done with the patient. Jennifer stated that she refused to lie on the insurance paperwork. Jennifer said that Dr. POMPY would have to sign the prior authorization forms. Dr. POMPY would sign these forms without looking at them.

129.   Dr. POMPY would also have some patients enter from the side door of the office. Jennifer does not know how Dr. POMPY was able to prescribe medication to these people as there was no record of their visit.

130.   Medical Assistants would let patients in at the side door and take them to a room. Dr. POMPY would visit with this patient alone. When Jennifer asked

other employees why Dr. POMPY was having Medical Assistants leave the room, she was told there are things going on that he does not want people to know.

131.   Jennifer would run MAPS reports on patients and was getting calls from pharmacies about Dr. POMPY's prescriptions.  The pharmacies asked why a patient was getting a medication from Dr. POMPY when they were getting similar prescriptions from other doctors.  Dr. POMPY would tell Jennifer to have the pharmacy fill the prescription anyway.

132.   Jennifer was suspicious of patients selling or abusing medications and would run a MAPS report without Dr. POMPY's knowledge.  On one occasion, Diana found out and questioned Jennifer about running MAPS reports and Diana said that the patients were fine.  Jennifer argued and said that the patients were high when they would come in.

133.   Jennifer stated that patients could wait for hours to see Dr. POMPY. Dr. POMPY on average would only spend 5 minutes with each patient.  Dr. POMPY was seeing 150 to 350 patients a day.

134.   Jennifer said that there were bonuses but she did not know what they were based on.

135.   Dr. POMPY believed that undercover DEA agents were trying to get prescriptions from him.  Dr. POMPY accused one patient of being a DEA agent

then accused yet another of "wearing a wire." Dr. POMPY acted suspicious of a number of patients that he assumed were undercover agents.

136.   Jennifer has seen patients bring in medication to Dr. POMPY and say that they were not working. Dr. POMPY took the medications and put them in his office. If a patient brought in a medication and said they were not working, Dr. POMPY would write a new prescription and allow the patient to keep the previous medication as well. Jennifer recalled that one patient would come in 5 times in a week and get prescriptions for 6 months because she lived out of state. When Jennifer asked how this was legal, Dr. POMPY would adjust the dates on the prescription to make it look as if they were issued a month apart. Jennifer stated that she assisted this patient one time, but after Dr. POMPY did this she refused to be involved with this patient again.

137.   Jennifer stated that she stumbled across the one death certificate that Dr. POMPY had to sign. When Jennifer asked about the death certificate the office manager, Diana told her that it was because, "Dr. POMPY OD'd her." Jennifer does not recall which patient the death certificate was for. In her discussion of the death certificate with Diana, Diana stated to Jennifer there were things going on that she did not want to know about.

138.   Jennifer said that Dr. POMPY was over his limit on Suboxone patients. Jennifer said that it was common for someone to come in for drug

40

addiction and get prescribed for Suboxone but the file would reflect they were there for pain to allow Dr. POMPY to have more patients. Jennifer explained that insurance companies would only authorize Suboxone for opiate dependence and not pain. If the patient was getting the Suboxone they would also require counseling, which Dr. POMPY claimed to be doing.

139. Jennifer estimated that Dr. POMPY had over 300 patients getting Suboxone for opiate dependence. Jennifer did not think that Dr. POMPY could be the prescribing doctor and the counselor. Most patients were not seeing a counselor and Dr. POMPY was not spending enough time with the patients to be a counselor. Dr. POMPY was charging opiate addiction patients for counseling services that they were not getting.

140. According to Jennifer almost every employee in the office was a patient and was getting narcotics from Dr. POMPY. Diana was also a patient, however, she had her file locked so that other employees could not get access to it.

E-Mails

141. An email from Diana Knight, Dr. POMPY's office manager, addressed to another employee and Dr. POMPY was obtained during a search of Dr. POMPY's office computers. The email is dated September 18, 2012 and discusses patient billing issues including the number of patients seen. The email states: "Just wanted you to know how short the billing papers are. We had 242

41

patients arrive on the 6th, I received 235 so we are short 7 people to bill. On the 10th we had 196 arrived. I billed for 176 so we are 20 short for that day. On the 11th we had 106 patients arrive, I billed 92 patients so we are 14 short on that date. The total is 41 short on papers to bill for 3 days."

142.    An email from Diana Knight to Dr. POMPY dated September 20, 2012 states: "The appointments need to be addressed as to how many are to be put into a time slot. You have 4 rooms open and no more than one patient should be assigned to one time slot. That's why you get so behind on seeing patients and then patients get so upset for having to wait 2 hours. Its not that you cant see over 200 patients a day and still have less confusion in the office if the time slots were not so full. It should not be 20 patients at 9am and 4 patients at 5pm. It needs to be one per slot no matter who that patient is or how much they cry about it for our office to run more efficiently. If they want 10am and its not open today put them on tomorrow and not add more than one per slot. If you want more patients on the scheduler then add more time slots to it, right now its 4 patients per line. We don't really want it more hectic in the office for the patients or for the staff as well. When we are better organized the patients will flow more easily threw the office and it will also be done correctly, this will cut down on the mistakes that the staff is making in the billing that are not being billed out."

Prescribing History

143.   BCBSM Investigator Brian Zasadny provided investigators with documentation of the prescribing history of Dr. POMPY for the 2014 calendar year.  The data was obtained from the Clinical Pharmacy Fraud, Waste and Abuse program at BCBSM.  Based upon the claims submitted to BCBSM, Dr. POMPY prescribed the largest quantity of prescription medication, the most controlled prescription medication, and the highest number of days-of- supply of controlled prescription medication of the 2,304 providers in his same specialty, in Michigan.

144.   Further, BCBSM determined that Dr. POMPY ranks first in 2015 for the total days-of- supply of controlled medication prescribed, average number of members per month receiving controlled prescription medication, and total quantity dispensed of controlled prescription medication of the 2,304 providers in his same specialty.  Data from the National Association of Drug Diversion Investigators (NADDI) indicates that in 2015, 96.13% of Dr. POMPY's patients covered by BCBSM insurance were prescribed controlled medications.

Medical Claims Analysis

145.   Current Procedural Terminology (CPT) codes related to evaluation and management (E&M) are billed by medical providers when an office visit is conducted and lists the required face to face time the physician must spend with the patient when billing for that type of visit.  CPT E&M codes include five (5)

CPT codes that cover the range in complexity of an office visit. As the complexity of the office visit increases, the CPT code increases as well as the reimbursement rate. The five (5) CPT codes for a new patient are 99201, 99202, 99203, 99204, and **99205**. The five (5) CPT codes for an existing patient are 99211, 99212, **99213**, 99214, and 99215.

146. BCBSM provided a list of the CPT Codes billed by INTERVENTIONAL for undercover office visits conducted by Investigator Howell. This included a list of the dates he had contact with Dr. POMPY, the claim number, approximate face-to-face time, and the required face-to-face time for the claim submitted.

147. On February 18, 2016, Investigator Howell reported that he spent eight minutes with Dr. POMPY, who filed a claim of 60 minutes of face-to-face time under claim code of 99205.

148. On 03/22/2016, Investigator Howell reported that he spent 37 seconds with Dr. POMPY, who filed a claim of 15 minutes of face-to-face time under claim code of 99213.

149. On 04/26/2016, Investigator Howell reported that he spent 51 seconds with Dr. POMPY, who filed a claim of 15 minutes of face-to-face time under claim code 99213.

150.   On 05/09/2016, Investigator Howell reported that he spent 1 minute 18 seconds with Dr. POMPY, who filed a claim of 15 minutes of face-to-face time under claim code 99213.

151.   On 05/17/2016, Investigator Howell reported that he spent 50 seconds with Dr. POMPY, who filed a claim of 15 minutes of face-to-face time under claim code 99213.

152.   Department of Health and Human Services, Office of the Inspector General Special Agent Michael Hendricks provided data from January 1, 2012 through January 1, 2017 for Medicare and Medicaid claims submitted by INTERVENTIONAL.  This data was added to BCBSM claims data submitted by INTERVENTIONAL from June 2, 2014 through December 29, 2016.

153.   An analysis of this data for billed hours, using CPT and HCPCS codes, for 2012 revealed **68 dates** that INTERVENTIONAL billed Medicare and Medicaid for **more than 24 hours** of Dr. POMPY's time each day.  Further, for 25 of those days INTERVENTIONAL billed more than 36 hours per day and for 4 days billed more than 48 hours per day.

154.   During 2013 there were **57 dates** that INTERVENTIONAL billed Medicare and Medicaid for **more than 24 hours** of Dr. POMPY's time in a single day with 9 of those days billing more than 36 hours each.

155.   During 2014 there were **78 dates** that INTERVENTIONAL billed Medicare, Medicaid, and BCBSM for **more than 24 hours** of Dr. POMPY's time in a single day.  Further, 27 of those days were billed for more than 36 hours each and 5 of those days were billed for more than 48 hours each.

156.   During 2015 there were **102 dates** that INTERVENTIONAL billed Medicare, Medicaid, and BCBSM for **more than 24 hours** of Dr. POMPY's time in a single day.  Further, 69 of those days were billed for more than 36 hours each and 23 of those days were billed for more than 48 hours each.

157.   During 2016 there were **77 dates** that INTERVENTIONAL billed Medicare, Medicaid, and BCBSM for **more than 24 hours** of Dr. POMPY's time in a single day.  Further, 55 of those days were billed for more than 36 hours each and 19 of those days were billed for more than 48 hours each.

158.   Dr. POMPY billed Medicare, Medicaid, and BCBSM approximately **382 times** for more than 24 hours in a single day during the review period.  It is important to note that these times only include Dr. POMPY seeing patients who are insured by Medicaid, Medicare, or BCBSM and do not include other private insurance and/or private pay clients.  Additionally, these times do not include other exams, tests, and procedures Dr. POMPY billed for on the same date.

159.   HHS SA Hendricks reported that from January 1, 2012, through October 1, 2016, INTERVENTIONAL billed Medicare Part B (Physician

Services) $6,203,971.02, for which Medicare paid $2,137,448.81. For the same time period INTERVENTIONAL billed Medicaid $6,084,810.41 for which Medicaid paid $1,515,080.77.

160. In sum, based on the above information, I believe there is probable cause that Dr. POMPY has knowingly prescribed controlled substances for other than legitimate medical reasons and outside the course of accepted professional practice in violation of 21 U.S.C. § 841(a)(1). Further, that Dr. POMPY accomplished his criminal enterprise through his INTERVENTIONAL medical office which he operated as a "Pill Mill" dedicated to providing its patients with prescriptions for controlled substances for the sole purpose of generating and keeping a large number of patients to fuel his deliberate and systematic Health Care Fraud scheme in violation of 18 U.S.C. § 1347.

161. On March 2, 2017, an Immediate Suspension Order was signed by DEA Acting Administrator Chuck Rosenberg suspending Dr. POMPY's DEA Certificates of Registration. The reason for the suspension stated that Dr. POMPY's continued registration constitutes an imminent danger to the public health and safety.

162. On August 4, 2017, the State of Michigan summarily suspended Dr. POMPY's medical license.

## **Financial Analysis**

163.   Defendant fraudulently obtained Medicare and Medicaid reimbursements into an account, denoted as the Tier 1 account. These funds were then disbursed from the Tier 1 account into Tier 2 accounts, and from Tier 2 accounts into Tier 3 accounts. Additionally, funds from one of the Tier 2 accounts were transferred back into the Tier 1 account, creating a cycle of the fraudulent funds. The following accounts contain proceeds of Dr. POMPY's health care fraud and/or were involved in money laundering to conceal the nature, location, source, ownership, and/or control of the funds:

| ACCOUNTS SUBJECT TO SEIZURE | | | |
|---|---|---|---|
| **Financial Institution** | **Account Number** | **Account Name** | **Tier** |
| Monroe Bank and Trust | 100054147 | Interventional Pain Management Associates, P.C. | 1 |
| Monroe Bank and Trust | 7007302049 | Interventional Pain Management Associates, P.C. | 2 |
| Monroe Bank and Trust | 206042147 | Lesly Pompy M.D. | 2 |
| Merrill Lynch | 65605235 | Interventional Pain Management Associates, PC, PSP FBP Lesly Pompy | 2 |
| Merrill Lynch | 65605234 | Interventional Pain Management Associates, PC, Profit Sharing Plan | 2 |
| E Trade Securities | 55618412 | Lesly Pompy | 3 |
| E Trade Securities | 62993195 | Lesly Pompy | 3 |

164.   Dr. POMPY is the sole signatory on all seven accounts.

165.   Based on my training and experience, I know that individuals engaged in criminal activity will knowingly conceal or disguise the nature, location, source, ownership or control of proceeds of unlawful activity by attempting to "launder" or

"clean" their criminal proceeds by means of: (a) **placing** illegal proceeds into the financial system through numerous deposits into multiple accounts; (b) disguising those deposits as the "legitimate" income of a business; (c) **layering** the proceeds between financial accounts; (d) comingling illegal proceeds with legitimate funds within those accounts; and (e) **integrating** those proceeds back into the mainstream financial system by means of investing in long term, interest bearing accounts for capital gain.  This process of <u>placement</u>, <u>layering</u> and <u>integration</u> is known as the Money Laundering Triangle and the method used by Dr. POMPY to launder large portions of his illegal proceeds.

166.   It is my understanding that one or more financial transactions which involve the commingling of illegally obtained funds with legitimate funds in a bank account taints all of the funds contained in the account if there is an intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, thereby making all of the funds in the account subject to seizure and forfeiture.

### Tier 1 Account

### Monroe Bank and Trust, Account No. 100054147, Held in the Name of Interventional Pain Management Associates, PC (MBT-4147)

167.   **MBT-4147** is a business checking account held in the name of Interventional Pain Management Associates, PC, and was the sole Electronic Funds repository account for receipt of payment for services from Medicare and

Medicaid, as well as eight other insurers, included BCBSM.  This account received

approximately $2,137,448.81 worth of deposits from Medicare and $1,515.080.77

worth of deposits from Medicaid via direct deposit from January 1, 2012 through

October 1, 2016.  Healthcare claims billed to Medicare and Medicaid by

INTERVENTIONAL and paid by direct deposit into **MBT-4147** are totaled below.

| | Medicare & Medicaid Claims from INTERVENTIONAL | | | |
|---|---|---|---|---|
| | Medicare | | Medicaid | |
| | Billed | Paid | Billed | Paid |
| 2012 | $1,269,088.45 | $490,768.76 | $1,144,124.60 | $231,632.50 |
| 2013 | $1,460,169.60 | $442,796.02 | $1,026,835.50 | $202,040.03 |
| 2014 | $1,087,697.75 | $375,454.09 | $1,114,186.50 | $256,148.97 |
| 2015 | $1,328,481.20 | $427,428.78 | $1,482,405.50 | $397,061.96 |
| 2016 | $1,058,534.02 | $401,001.16 | $1,317,258.31 | $428,197.31 |
| | $6,203,971.02 | $2,137,448.81 | $6,084,810.41 | $1,515,080.77 |

168.   An analysis of account activity from January 1, 2013 through July 29,

2016 revealed that **MBT-4147** was the main account used by Dr. POMPY for

INTERVENTIONAL business deposits, payroll, and business expenses.  Health

care claim deposits for the review period are totaled below.

| Health Care Provider Deposits to MBT-4147 (Total by Year) | |
|---|---|
| 2013 | $980,128.15 |
| 2014 | $1,162,989.15 |
| 2015 | $1,376,226.46 |
| 2016 | $925,947.86 |
| Grand Total: | $4,445,291.62 |

169.   Given the facts obtained during the investigation of this matter, and

set forth herein, there is probable cause to believe that approximately $2.1 million

in Medicare reimbursements and approximately $1.5 million in Medicaid

reimbursements deposited into this account between January 1, 2013 and July 29,

2016, constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347,

respectively, and that any legitimate funds were commingled with illegitimate

funds.

### Tier 2 Accounts

### Monroe Bank and Trust, Account No. 7007302049, Held in the Name of Interventional Pain Management Associates, PC (MBT-2049)

170.   **MBT-2049** is a MB&T Super Money Market Account held in the

name of Interventional Pain Management Associates, PC.  **MBT-2049** was

"paired" with **MBT-4147** as its direct deposit account, so that when the balance of

**MBT-4147** exceeds a predetermined threshold amount, the excess funds were

automatically transferred to **MBT-2049** in $1,000.00 increments.  The bank

automatically transferred money back into MBT-4147, in $1,000.00 increments, as

required to honor checks or other drafts thus maximizing the amount of money

held at the higher interest rate.  **MBT-2049** was solely funded by transfers from

MBT-4147 shown to contain Dr. POMPY's illegal proceeds.  **MBT-2049** received

at least the following deposits from the Tier 1 account:

| Transfers From MBT-4147 (Total by Year) | |
|---|---|
| 2013 | $1,145,000.00 |
| 2014 | $1,043,000.00 |
| 2015 | $1,306,000.00 |
| 2016 | $923,000.00 |
| Grand Total: | **$4,417,000.000** |

171.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that approximately $3.6 million in funds deposited into this account from Tier 1 account **MBT-4147** (INTERVENTIONAL) were Medicare and Medicaid reimbursements and therefore constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347 and that any legitimate funds were commingled with illegitimate funds.

### Monroe Bank and Trust, Account No. 206042147, Held in the Name of Lesly Pompy M.D. (MBT-2147)

172.   **MBT-2147** is a business checking account held in the name of Lesly Pompy M.D.  An analysis of account activity from January 1, 2012 through July 29, 2016 revealed that **MBT-2147** was primarily funded by 36 checks drawn from MBT-4147, known to contain illegal proceeds, and made payable to Dr. POMPY. Deposits of these checks are summarized below.

| Check Deposits to MBT-2147 (payable to Dr.POMPY) from MBT-4147 (Total by Year) | |
|---|---|
| 2012 | $161,624.59 |
| 2013 | $115,916.33 |
| 2014 | $124,493.42 |
| 2015 | $165,332.00 |
| Grand Total: | $567,366.34 |

173.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that the funds deposited into this account from Tier 1 account **MBT-4147** (INTERVENTIONAL) were Medicare and Medicaid reimbursements and therefore constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347 and that any legitimate funds were commingled with illegitimate funds.

174.   There is probable cause to believe that funds were transferred from Tier 1 account **MBT-4147** (INTERVENTIONAL) to this account, from which funds were transferred to Tier 3 accounts, in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

175.   There is also probable cause to believe that at least the deposits set forth in the following table from Tier 1 accounts constituted a violation of 18 U.S.C. § 1957 in that:  (1) each deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from health care fraud in violation of 18

53

U.S.C. § 1347, which is a specified unlawful activities under 18 U.S.C.

§ 1956(c)(7)(F); and (4) each transaction occurred in the United States.

| TIER ONE Account | Date | Amount |
|---|---|---|
| MBT-4147 (INTERVENTIONAL) | 4/16/2012 | $12,831.49 |
| MBT-4147 (INTERVENTIONAL) | 7/11/2012 | $56,227.48 |
| MBT-4147 (INTERVENTIONAL) | 12/10/2012 | $57,353.08 |
| MBT-4147 (INTERVENTIONAL) | 1/14/2013 | $12,489.52 |
| MBT-4147 (INTERVENTIONAL) | 1/14/2013 | $12,886.95 |
| MBT-4147 (INTERVENTIONAL) | 3/4/2013 | $12,524.18 |
| MBT-4147 (INTERVENTIONAL) | 7/23/2013 | $12,524.18 |
| MBT-4147 (INTERVENTIONAL) | 7/23/2013 | $12,524.18 |
| MBT-4147 (INTERVENTIONAL) | 8/16/2013 | $12,524.18 |
| MBT-4147 (INTERVENTIONAL) | 8/16/2013 | $12,914.78 |
| MBT-4147 (INTERVENTIONAL) | 9/12/2013 | $13,764.18 |
| MBT-4147 (INTERVENTIONAL) | 12/4/2013 | $13,764.18 |
| MBT-4147 (INTERVENTIONAL) | 1/10/2014 | $13,764.18 |
| MBT-4147 (INTERVENTIONAL) | 1/10/2014 | $24,000.00 |
| MBT-4147 (INTERVENTIONAL) | 4/10/2014 | $36,014.98 |
| MBT-4147 (INTERVENTIONAL) | 4/30/2014 | $13,764.18 |
| MBT-4147 (INTERVENTIONAL) | 5/15/2015 | $12,549.82 |
| MBT-4147 (INTERVENTIONAL) | 12/11/2015 | $34,944.29 |
| MBT-4147 (INTERVENTIONAL) | 12/28/2015 | $70,000.00 |

**Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605235, Held in the Name of Interventional Pain Management Associates, PC, PSP, FBO Lesly Pompy (ML-5235)**

176.   A financial review of **ML-5235** from January 1, 2012 through January 1, 2017, revealed that Dr. POMPY solely funded **ML-5235** with checks drawn from MBT-4147 shown to contain his illegal proceeds.  Deposits for the review period are shown below.

| Check Deposits to Merrill Lynch | | | |
|---|---|---|---|
| From | Date | Deposit Acct | Amount |
| MBT4147 | 9/7/2012 | ML-5235 | $49,000.00 |
| MBT4147 | 9/11/2013 | ML-5235 | $15,000.00 |
| MBT4147 | 8/15/2014 | ML-5235 | $51,000.00 |
| MBT4147 | 8/3/2015 | ML-5235 | $52,000.00 |
| MBT4147 | 7/28/2016 | ML-5235 | $53,000.00 |
| | | Total: | $220,000.00 |

177.   Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that the funds deposited into this account from Tier 1 account **MBT-4147** (INTERVENTIONAL) were Medicare and Medicaid reimbursements and therefore constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347 and that any legitimate funds were commingled with illegitimate funds.

178.   There is probable cause to believe that funds were transferred from Tier 1 account **MBT-4147** (INTERVENTIONAL) to this account in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

179.   There is also probable cause to believe that at least the deposits set forth in the following table from Tier 1 accounts constituted a violation of 18 U.S.C. § 1957 in that:  (1) each deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from health care fraud in violation of 18

U.S.C. § 1347, which is specified unlawful activities under 18 U.S.C.

§ 1956(c)(7)(F); and (4) each transaction occurred in the United States.

| TIER ONE Account | Date | Amount |
|---|---|---|
| MBT-4147 (INTERVENTIONAL) | 9/7/2012 | $49,000.00 |
| MBT-4147 (INTERVENTIONAL) | 9/11/2013 | $15,000.00 |
| MBT-4147 (INTERVENTIONAL) | 8/15/2014 | $51,000.00 |
| MBT-4147 (INTERVENTIONAL) | 8/3/2015 | $52,000.00 |
| MBT-4147 (INTERVENTIONAL) | 7/28/2016 | $53,000.00 |

**Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605234, Held in the Name of Interventional Pain Management Associates, PC, Profit Sharing Plan (ML-5234)**

180.   A financial review of account **ML-5234** from January 1, 2012,

through January 1, 2017, revealed that Dr. POMPY funded the account solely with

checks drawn from MBT-4147 shown to contain his illegal proceeds. Deposits for

the review period are shown below.

| Check Deposits to ML-5234 | | | |
|---|---|---|---|
| From | Date | Deposit Acct | Amount |
| MBT4147 | 9/7/2012 | ML-5234 | $8,278.89 |
| MBT4147 | 9/11/2013 | ML-5234 | $7,212.28 |
| MBT4147 | 8/15/2014 | ML-5234 | $12,073.43 |
| MBT4147 | 8/3/2015 | ML-5234 | $10,948.00 |
| MBT4147 | 7/28/2016 | ML-5234 | $14,080.02 |
| | | Total: | $52,592.62 |

181.   Given the facts obtained during the investigation of this matter, and

set forth herein, there is probable cause to believe that the funds deposited into this

account from Tier 1 account MBT-4147 (INTERVENTIONAL) were Medicare

and Medicaid reimbursements and therefore constituted proceeds of health care

fraud in violation of 18 U.S.C. § 1347 and that any legitimate funds were commingled with illegitimate funds.

182. There is probable cause to believe that funds were transferred from Tier 1 account MBT-4147 (INTERVENTIONAL) to this account in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

183. There is also probable cause to believe that at least the deposits set forth in the following table from Tier 1 accounts constituted a violation of 18 U.S.C. § 1957 in that: (1) each deposit was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activities under 18 U.S.C. § 1956(c)(7)(F); and (4) each transaction occurred in the United States.

| TIER ONE Account | Date | Amount |
|---|---|---|
| MBT-4147 (INTERVENTIONAL) | 8/15/2014 | $12,073.43 |
| MBT-4147 (INTERVENTIONAL) | 8/3/2015 | $10,948.00 |
| MBT-4147 (INTERVENTIONAL) | 7/28/2016 | $14,080.02 |

**E Trade Securities, LLC, Account No. 55618412, Held in the name of LESLY POMPY (ET-8412)**

184. A financial analysis of account **ET-8412** from January 1, 2012, through January 1, 2017, revealed that Dr. POMPY almost solely funded **ET-8412**

with ACH transfers from Tier 2 account MBT-2147. Specifically, Dr. POMPY

made at least 29 transfers from MBT-2147 to **ET-8412** totaling $454,000.00.

185.   Given the facts obtained during the investigation of this matter, there

is probable cause to believe that the funds deposited into this account from Tier 2

account MBT-2147 (POMPY) were Medicare and Medicaid reimbursements and

therefore constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347

and that any legitimate funds were commingled with illegitimate funds.

186.   There is probable cause to believe that funds were transferred from

Tier 2 account MBT-2147 (POMPY) to this account in order to conceal or disguise

the nature, source, location, ownership, and control of the criminal proceeds in

violation of 18 U.S.C. § 1956(a)(1)(B)(i).

187.   There is also probable cause to believe that at least the deposits set

forth in the following table from Tier 2 accounts constituted a violation of 18

U.S.C. § 1957 in that:  (1) each deposit was a monetary transaction involving

criminally derived funds; (2) those criminally derived funds had a value greater

than $10,000; (3) the funds were derived from health care fraud in violation of 18

U.S.C. § 1347, which is a specified unlawful activities under 18 U.S.C.

§ 1956(c)(7)(F); and (4) each transaction occurred in the United States.

| TIER ONE Account | Date | Amount |
|---|---|---|
| MBT-2147 (POMPY) | 6/13/2012 | $30,000.00 |
| MBT-2147 (POMPY) | 9/5/2012 | $40,000.00 |
| MBT-2147 (POMPY) | 12/5/2012 | $20,000.00 |
| MBT-2147 (POMPY) | 8/21/2013 | $50,000.00 |
| MBT-2147 (POMPY) | 2/3/2014 | $22,000.00 |
| MBT-2147 (POMPY) | 5/16/2014 | $25,000.00 |
| MBT-2147 (POMPY) | 9/22/2014 | $40,000.00 |
| MBT-2147 (POMPY) | 1/20/2016 | $50,000.00 |

**E Trade Securities, LLC, Account No. 62993195 Held in the Name of LESLY POMPY (ET-3195)**

188.   A financial analysis of account activity in **ET-3195** from January 1, 2012 through January 1, 2017, revealed that Dr. POMPY funded **ET-3195** with **$17,000.00** in ACH transfers from MBT-2147, shown to contain his criminal proceeds.

189.   Given the facts obtained during the investigation of this matter, there is probable cause to believe that the funds deposited into this account from Tier 2 account MBT-2147 (POMPY) were Medicare and Medicaid reimbursements and therefore constituted proceeds of health care fraud in violation of 18 U.S.C. § 1347 and that any legitimate funds were commingled with illegitimate funds.

190.   There is probable cause to believe that funds were transferred from Tier 2 account MBT-2147 (POMPY) to this account in order to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## Conclusion

191.   I am aware that Title 18 U.S.C. § 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under 28 U.S.C. § 1355(b), and may be executed in any district in which the property is found.

192.   I am aware that Title 28 U.S.C. § 1355(b) authorizes the filing of a forfeiture action in the District Court for the district in which any of the action or omission giving rise to the forfeiture occurred.

193.   Based on the information contained herein there is probable cause to believe that; (a) Dr. POMPY directed and was responsible for a criminal scheme involving the intentional prescribing of controlled substances for other than legitimate medical reasons and outside the course of accepted professional practice in violation of 21 U.S.C. § 841(a)(1) (Illegal Distribution of Controlled Substances); (b) Dr. POMPY accomplished his criminal enterprise through his INTERVENTIONAL medical office which he operated as a "Pill Mill" dedicated to providing its patients with prescriptions for controlled substances for the sole purpose of generating and keeping a large number of patients to fuel his deliberate and systematic Health Care Fraud scheme in violation of 18 U.S.C. § 1347; (c) all of these violations constitute "specified unlawful activity"; (d) Dr. POMPY utilized his financial accounts to deposit/invest his criminal proceeds and to

maneuver and manipulate those criminal proceeds in a manner that both funded the continuation of the criminal enterprise and attempted to conceal and/or disguise the nature, location, source, ownership, or control of those proceeds in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 1956(a)(1)(B)(i); and (e) many of these transactions were in excess of $10,000.00 in violation of 18 U.S.C. § 1957(a).

194. The funds are therefore subject to seizure and civil forfeiture to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and/or are subject to seizure and criminal forfeiture pursuant to 18 U.S.C. § 982(a) and/or Title 18 U.S.C. § 981(a)(1)(C) together with 28 U.S.C. § 2461.

195. Based on the information contained in this affidavit, I respectfully request that an anticipatory seizure warrant be issued to seize, for civil and/or criminal forfeiture, the enumerated funds on deposit and/or contained in the following accounts upon the entry of a turnover order, or order otherwise relinquishing jurisdiction over the Target Accounts, by the State of Michigan Circuit Court for the County of Monroe:

- **Up to $3.6 Million on deposit at Monroe Bank and Trust, Account No. 100054147, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC;**

- **Up to $ 3.6 Million on deposit at Monroe Bank and Trust, Account No. 7007302049, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC;**

- **All funds on deposit at Monroe Bank and Trust, Account No. 206042147, titled as LESLY POMPY M.D.;**

- **All funds on deposit at Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605235, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC, PSP FBO LESLY POMPY;**

- **All funds on deposit at Merrill Lynch, Pierce, Fenner & Smith, Account No. 65605234, titled as INTERVENTIONAL PAIN MANAGEMENT ASSOCIATES, PC, PROFIT SHARING PLAN;**

- **All funds on deposit at E Trade Securities, LLC, Account No. 55618412, in the name of LESLY POMPY;**

- **All funds on deposit at E Trade Securities, LLC, Account No. 62993195, in the name of LESLY POMPY.**

196.   I further request that the Court warrant and authorize the DEA to effect seizure of the Target Accounts, at its own discretion, by directing the financial institutions at which the accounts are established, to do any of the following without further order of the Court:

**To freeze the contents of the account in place, to refuse to liquidate the account, and to refuse the withdrawal of any of the funds from the account by anyone other than the DEA, and, while any contents of the account are frozen in place,  to accrue any interest, dividends, and any other amount credited to the account until the FBI directs that the contents of the account be finally liquidated; or**

**To liquidate some or all of the contents of the account at one or more times ta the direction of the FBI, and upon which any such liquidation of any contents to turn over the liquidated amount to the FBI, any such direction of the FBI shall be deemed to be the direction of the Court under this warrant**

## REQUEST FOR SEALING

197.   I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Lloyd G. Hopkins, Special Agent

Sworn to before me and signed in my presence
and/or by reliable electronic means.

HONORABLE ELIZABETH A. STAFFORD
UNITED STATES MAGISTRATE JUDGE

Dated: _____ February 15, 2018

63

## Attachment A

All Funds on Deposit in following Monroe Bank and Trust Accounts with permission to serve the warrant electronically followed by original service.

    a.   Monroe Bank and Trust Account Number 100054147
    b.   Monroe Bank and Trust Account Number 7007302049
    c.   Monroe Bank and Trust Account Number 206042147

The DEA is authorized to effect the seizure of the contents of each account by, in its discretion, directing the financial institution at which the account is established to do any of the following without further order of the Court: (a)To freeze the contents of the account in place, and to refuse the withdrawal of any funds from the account by anyone other than the DEA, and, while any contents of the account are frozen in place, to accrue any interest, dividends, and any other amount credited to the account until the DEA directs that the contents of the account be finally liquidated; or (b) To liquidate some or all of the contents of the account at one or more times at the direction of the DEA, and upon any such liquidation of any contents to turn over the liquidated amount to the DEA.

AUSA:  Shankar Ramamurthy          Telephone:  (313) 226-9562

AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture  Special Agent:        Lloyd G. Hopkins          Telephone:  (313) 234-4347

# UNITED STATES DISTRICT COURT
### for the

Eastern District of Michigan

|  |  |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>All Funds on Deposit in three Monroe Bank and Trust<br>accounts as further described in Attachment A | )<br>)<br>)<br>)<br>) |

Case: 2:18−mc−50273-1
Assigned To : Goldsmith, Mark A.
Assign. Date : 2/15/2018
Case No. Description: SEARCH/SEIZURE WARRANT
(SO)

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

    An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the _____ Eastern _____ District of _____ Michigan _____ be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

All Funds on Deposit in three Monroe Bank and Trust accounts as further described in Attachment A, upon entry of an order by the State of Michigan Circuit Court for the County of Monroe, relinquishing jurisdiction over the enumerated accounts.

    I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

    **YOU ARE COMMANDED** to execute this warrant and seize the property on or before March 1, 2018 _____
                                                                                    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

    An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty _____ .
                    *(United States Magistrate Judge)*

    ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days (not to exceed 30) .  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    February 15, 2018  12:13 pm     *Elizabeth A. Stafford*
                                                             *Judge's signature*

City and state:   Detroit, MI _____     Elizabeth A. Stafford    U. S. Magistrate Judge
                                                       *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| Certification |
|---|
|    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*